SQUIRE SANDERS (US) LLP
Mark C. Dosker (CA Bar # 114789)
mark.dosker@squiresanders.com
275 Battery Street, Suite 2600
San Francisco, CA 94111
Telephone: +1.415.954.0200
Facsimile: +1.415.393.9887

Attorneys for Defendant
SEARS, ROEBUCK AND CO.
(*additional attorneys listed on signature page*)

LATHAM & WATKINS LLP
Svetlana M. Berman (CA Bar # 239445)
svetlana.berman@lw.com
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095

Attorneys for Defendant
ELECTROLUX HOME PRODUCTS, INC.
(*additional attorneys listed on signature page*)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTIN MURRAY, individually, on behalf of the General Public and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>*v.*<br><br>SEARS, ROEBUCK AND CO., a corporation; ELECTROLUX HOME PRODUCTS, INC., a corporation; DOES 1-100,<br><br>Defendants. | Case No. C-09-5744-CW<br><br>**CLASS ACTION**<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF MURRAY'S MOTION FOR CLASS CERTIFICATION**<br><br>Date: March 14, 2013<br>Time: 2:00 PM<br>Place: Courtroom 2 |

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

COMMON ABBREVIATIONS USED ........ v

I. INTRODUCTION ........ 1

II. RELEVANT FACTUAL BACKGROUND ........ 2

A. Sears, Electrolux, And Kenmore Dryers ........ 2

1. Multiple Different Features May Be Present on Any Given Dryer ........ 3

2. Advertising and Marketing of the Stainless-Steel Drummed Dryers ........ 3

3. Construction of the Kenmore and Frigidaire Drum Assemblies ........ 5

4. Complaints Regarding Rust in Dryer Drums Are Exceedingly Rare ........ 6

B. Plaintiff's Counsel Files Suit Against Sears In Illinois ........ 7

C. Plaintiff's Counsel Files Suit Against Sears And Electrolux In California ........ 7

1. Murray Purchases a Kenmore Dryer from Sears ........ 8

2. Murray Allegedly Experiences Problems with His Dryer ........ 9

III. ARGUMENT ........ 10

A. This Court Should Show Comity Toward *Thorogood I* ........ 10

B. Murray Cannot Satisfy The Prerequisites Of Rule 23(a) ........ 12

1. Murray Has Shown No Common Questions of Law or Fact ........ 12

a. There is no evidence of a common injury ........ 13

b. There is no common misrepresentation as to the stainless-steel drum ........ 15

2. Murray Is Not a Typical or Adequate Representative of His Proposed Class ........ 17

a. Murray's dryer differs from that of other class members ........ 17

b. Murray is subject to unique defenses ........ 18

C. Murray Cannot Satisfy The Requirements Of Rule 23(b)(3) ... 21

1. Common Questions of Law or Fact Do Not Predominate ... 21

a. Reliance cannot be presumed, and individual issues will predominate ... 21

b. Materiality will require individual inquiries ... 22

c. Individual determinations preclude certification of Murray's unjust enrichment and breach of contract claims ... 24

2. A Class Action Is Not a Superior Vehicle for Resolving Murray's Claims ... 25

IV. CONCLUSION ... 25

# TABLE OF AUTHORITIES

## CASES


*Adams v. Albertson*, 2012 U.S. Dist. LEXIS 50904 (N.D. Cal. 2012) .......... 14

*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) .......... 21

*Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974) .......... 20

*Baker v. Microsoft Corp.*, 851 F. Supp. 2d 1274 (W.D. Wash. 2012) .......... 11

*Briosos v. Wells Fargo Bank*, 2011 U.S. Dist. LEXIS 48569 (N.D. Cal. 2011) .......... 19

*Carrea v. Dreyer's Grand Ice Cream, Inc.*, 2011 U.S. Dist. LEXIS 6371 (N.D. Cal. 2011) .......... 18

*Cartwright v. Viking Indus.*, 2009 U.S. Dist. LEXIS 83286 (E.D. Cal. 2009) .......... 24

*Cohen v. DirectTV, Inc.*, 178 Cal. App. 4th 966 (2d Dist. 2009) .......... 22

*Deitz v. Comcast Corp.*, 2007 U.S. Dist. LEXIS 53188 (N.D. Cal. 2007) .......... 24

*Doe v. Roman Catholic Bishop of Sacramento*, 189 Cal. App. 4th 1423 (3d Dist. 2010) .......... 20

*Edwards v. Ford Motor Co.*, 2012 U.S. Dist. LEXIS 81330 (S.D. Cal. 2012) .......... 22-24

*Edwards v. Zenimax Media, Inc.*, 2012 U.S. Dist. LEXIS 137520 (D. Colo. 2012) .......... 11

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) .......... 14

*Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147 (1982) .......... 17

*Gonzalez v. P&G Co.*, 247 F.R.D. 616 (S.D. Cal. 2007) .......... 17

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992) .......... 17-18

*Haugh v. Depuy-Motech, Inc.*, 14 Fed. Appx. 883 (9th Cir. 2001) .......... 20

*In re Facebook, Inc., PPC Adver. Litig.*, 282 F.R.D. 446 (N.D. Cal. 2012) .......... 25

*In re Tobacco II Cases*, 46 Cal. 4th 298 (2009) .......... 21

*In re Toyota Motor Corp. Hybrid Brake Mktg.*, 2013 U.S. Dist. LEXIS 4295 (C.D. Cal. 2013) .......... 13

*In re Vioxx Class Cases*, 180 Cal. App. 4th 116 (2d Dist. 2009) .......... 22

*Johns v. Bayer Corp.*, 2010 U.S. Dist. LEXIS 10926 (S.D. Cal. 2010) .......... 19

*Johnson v. Harley-Davidson Motor Co.*, 285 F.R.D. 573, 2012 U.S. Dist. LEXIS 72048 (E.D. Cal. 2012) .......... 14, 24

*Keilholtz v. Super. Fireplace Co.*, 2009 U.S. Dist. LEXIS 30732 (N.D. Cal. 2009) .......... 19

*Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004) .......... 24

*Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342 (2d Dist. 2012) .......... 24

*Knapp v. AT&T Wireless Servs., Inc.*, 195 Cal. App. 4th 932 (4th Dist. 2011) .......... 15-16

*Kreek v. Wells Fargo & Co.*, 652 F. Supp. 2d 1053 (N.D. Cal. 2009) .......... 21

*Madani v. Shell Oil Co.*, 2008 U.S. Dist. LEXIS 114535 (C.D. Cal. 2008) .......... 20

*Mateo v. V.F. Corp.*, 2009 U.S. Dist. LEXIS 105921 (N.D. Cal. 2009) .......... 18

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012)............................................21-22
*Mlejnecky v. Olympus Imaging Am., Inc.*, 2011 U.S. Dist. LEXIS 42333 (E.D. Cal. 2011) ............................................................................................................ 19
*Robbin v. Fluor Corp.*, 835 F.2d 213 (9th Cir. 1987)...................................................20-21
*Sanchez v. Wal-Mart Stores, Inc.*, 2009 U.S. Dist. LEXIS 48428 (E.D. Cal. 2009) .................... 13
*Smith v. Bayer Corp.*, 131 S. Ct. 2368 (2011) .......................................................2, 11-12
*Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742 (7th Cir. 2008)....................1, 7, 11-13, 16-17
*Thorogood v. Sears, Roebuck & Co.*, 595 F.3d 750 (7th Cir. 2010).......................................... 7
*Thorogood v. Sears, Roebuck & Co.*, 624 F.3d 842 (7th Cir. 2010)...................................... 7, 11
*Thorogood v. Sears, Roebuck & Co.*, 678 F.3d 546 (7th Cir. 2012).......................................... 11
*Unger v. Amedisys, Inc.*, 401 F.3d 316 (9th Cir. 2005) ................................................. 14
*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) .................................... 10, 13, 17, 21
*Wang v. OCZ Tech. Group Inc.*, 276 F.R.D. 618 (N.D. Cal. 2011)........................................ 19
*Westways World Travel, Inc. v. AMR, Corp.*, 2005 U.S. Dist. LEXIS 47291 (C.D. Cal. 2005)............................................................................................................ 24
*Wiener v. Dannon Co.*, 255 F.R.D. 658 (C.D. Cal. 2009) ..........................................17-18
*Williams v. Boeing Co.*, 517 F.3d 1120 (9th Cir. 2008)................................................ 20
*Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001)................................ 25

## STATUTES AND RULES

Cal. Bus. & Prof. Code § 17208 ........................................................................ 19
Cal. Civ. Code § 1783.................................................................................... 19
Cal. Code Civ. P. § 337................................................................................. 19
Cal. Code Civ. P. § 338................................................................................. 19
Fed. R. Civ. P. 23(a)............................................................................... 12, 17
Fed. R. Civ. P. 23(b) ..................................................................................... 21

## OTHER AUTHORITY

PRINCIPLES OF THE LAW OF AGGREGATE LITIG. §2.11 (2010) ........................................ 11
5 MOORE'S FEDERAL PRACTICE - CIVIL § 23.24 (3d ed. 1997)........................................ 18

## COMMON ABBREVIATIONS USED

**Pleadings**

| | | |
|---|---|---|
| FAC | - | First Amended Complaint (Dkt. 106). |
| Motion or Mot. | - | Pltf. Murray's Motion for Class Certification (Dkt. 167). |
| Not. of Removal | - | Notice of Removal (Dkt. 1). |
| Opp. to Str. Class Cl. | - | Pltf. Murray's Opp. to Defs.' Mot. to Continue Stay of Discovery or, in the Alternative, to Strike Class Allegations (Dkt. 98). |
| Opp. to Str. FAC Class Cl. | - | Pltf. Murray's Opp. to Defs.' Mot. to Strike Class Allegations from Pltf.'s First Amend. Compl. (Dkt. 116). |
| Opp. to Ext. of Time | - | Pltf. Murray's Opp. to Defs.' Mot. for Ext. of Time to Resp. to Pltf.'s Mot. for Class Cert. (Dkt. 179). |
| Order Gr. Mot. to Str. | - | Order Granting Defs.' Mot. to Strike Class Action Allegations and Denying Defs.' Mot. to Stay Discovery (Dkt. 104). |
| Order Den. Mot. to Str. | - | Order Denying Defs.' Mot. to Strike Class Action Allegations (Dkt. 120). |

**Legal Authorities**

| | | |
|---|---|---|
| CLRA | - | Consumer Legal Remedies Act (Cal. Civ. Code §§ 1750 *et seq.*). |
| *Thorogood I* | - | *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742 (7th Cir. 2008). |
| *Thorogood II* | - | *Thorogood v. Sears, Roebuck & Co.*, 595 F.3d 750 (7th Cir. 2010). |
| *Thorogood III* | - | *Thorogood v. Sears, Roebuck & Co.*, 624 F.3d 842 (7th Cir. 2010). |
| *Thorogood IV* | - | *Thorogood v. Sears, Roebuck & Co.*, 678 F.3d 546 (7th Cir. 2012). |
| UCL | - | Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*). |

**Declarations**

| | | |
|---|---|---|
| Boling Dec. | - | Declaration of Mark Boling (Dkt. 167-2). |

| | | |
|---|---|---|
| King Dec. | - | Declaration of Carl King (attached hereto as Exhibit A). |
| Murray Dec. | - | Declaration of Martin Murray (Dkt. 167-4). |
| Oliss Dec. | - | Declaration of Philip Oliss (filed contemporaneously herewith). |
| Wood Dec. | - | Declaration of Lori Wood (attached hereto as Exhibit B). |
| Stip. Facts | - | Parties' Stipulated Facts (attached to Oliss Dec. at Exhibit A). |

**<u>Expert Disclosures</u>**

| | | |
|---|---|---|
| Kivetz Rep. | - | Defendants' Expert Disclosure – Dr. Ran Kivetz, Professor of Marketing, Columbia University Business School (filed contemporaneously herewith). |
| Thomas Rep. | - | Pltf.'s Rule 26(a)(2) Expert Disclosures (Dkt. 168). |
| Thomas Errata | - | Errata Sheet to Pltf.'s Rule 26(a)(2) Expert Disclosures (Dkt. 178). |

**<u>Deposition Excerpts</u>**

| | | |
|---|---|---|
| Blum Tr. | - | Deposition of Dennis Blum (Sept. 21, 2012) (excerpt attached to Oliss Dec. at Exhibit B). |
| Christiansen Tr. | - | Deposition of Eva Christiansen (Nov. 7, 2012) (excerpt attached to Oliss Dec. at Exhibit C). |
| Daley Tr. | - | Deposition of Leslie Daley (Aug. 22, 2012) (excerpt attached to Oliss Dec. at Exhibit D). |
| Hargrave Tr. | - | Deposition of Michael Hargrave (Nov. 19, 2012) (excerpt attached to Oliss Dec. at Exhibit E). |
| Hess Tr. | - | Deposition of William Hess (Aug. 30, 2012) (excerpt attached to Oliss Dec. at Exhibit F). |
| Jergens Tr. | - | Deposition of John Jergens (Oct. 23, 2012) (excerpt attached to Oliss Dec. at Exhibit G). |
| King Tr. | - | Deposition of Carl King (Oct. 24, 2012) (excerpt attached to Oliss Dec. at Exhibit H). |
| Murray Tr. | - | Deposition of Martin Murray (Nov. 9, 2012) (excerpt attached to Oliss Dec. at Exhibit I). |

| | | |
|---|---|---|
| Pigatto Tr. | - | Deposition of Daniel Pigatto (Sept. 10, 2012) (excerpt attached to Oliss Dec. at Exhibit J). |
| Ripley Tr. | - | Deposition of Brian Ripley (Sept. 14, 2012) (excerpt attached to Oliss Dec. at Exhibit K). |
| Roth Tr. | - | Deposition of Darren Roth (Nov. 19, 2012) (excerpt attached to Oliss Dec. at Exhibit L). |
| Stoneking Tr. | - | Deposition of Jerome Stoneking (Aug. 30, 2012) (excerpt attached to Oliss Dec. at Exhibit M). |
| Thomas Tr. | - | Deposition of Lisa Thomas (Dec. 28, 2012) (excerpt attached to Oliss Dec. at Exhibit N). |
| Thorogood Tr. | - | Deposition of Steven Thorogood (June 4, 2007) (excerpt attached to Oliss Dec. at Exhibit O). |
| Wood Tr. | - | Deposition of Lori Wood (Sept. 17, 2012) (excerpt attached to Oliss Dec. at Exhibit P). |
| **Note on Citation** | | Unless stated otherwise, all emphases in quotations used in this Opposition are supplied and all internal citations and quotations omitted. |

## I. <u>INTRODUCTION</u>

After the Seventh Circuit rejected the attempt by counsel for Plaintiff Martin Murray to certify a class challenging the designation of certain Kenmore dryers as "stainless steel," *Thorogood I*, 547 F.3d at 748, Murray's counsel filed this suit, promising that, while its nucleus of operative facts matched *Thorogood*, new, stronger evidence would be shown to overcome the deficiencies of *Thorogood*. Acknowledging that *Thorogood* was a "weak candidate" for class treatment because it rested on the thin allegation that the words "stainless steel" appeared on the consoles of the dryers at issue, Opp. to Str. FAC Class Cl. at 21, Murray promised to show a "large-scale, extensive, long-lasting, and uniform program of deceptive advertising" and "**specific actionable statements** to the California general public and Sears' customers that the 'stainless steel' dryer drum **eliminates rust** as being a **primary feature**[.]" *Id.* at 9; *id.* at 14 ("In contrast, Thorogood alleges that Sears advertised the dryer with a stainless steel drum. **<u>That's all!</u>**") (emph. in orig.); Opp. to Str. Class Cl. at 28 (emph. in orig.). In denying Defendants' motion to strike the class claims, this Court held that the FAC "includes allegations that Defendants expressly advertised the significance of the fact that their dryers contain stainless steel drums." Order Den. Mot. to Str. at 7.

After 2 years, 17 depositions, and 6,487 pages of additional discovery, Murray has failed to deliver on his promise. There is ***no*** evidence of any uniform advertising of the dryers in this case (the "Subject Dryers"), let alone a "large-scale, extensive, long-lasting" campaign that advertised the benefits of stainless-steel drums. There is ***no*** evidence that class members suffered any injury, let alone a common injury, as the result of rust in the stainless-steel drums of their dryers. There is ***no*** evidence that any member of the proposed class, including Murray, paid a premium for a dryer with a stainless-steel drum.

As in *Thorogood*, Murray ultimately relies on the words "stainless steel" printed on the

dryers' consoles, along with broad, unsupported allegations of misrepresentations and omissions. Mot. at 2 ("The Products had the words 'Stainless Steel' prominently imprinted in the middle of the front console… The words 'Stainless Steel' implies by its name that the part will not rust."). The U.S. Supreme Court has unanimously stated that it "expect[s] federal courts to apply principles of comity to each other's class certification decisions when addressing a common dispute." *Smith v. Bayer Corp.*, 131 S.Ct. 2368, 2382 (2011). Particularly because this case reflects "deliberate maneuvering to avoid the effects of *Thorogood*," Order Gr. Mot. to Str. at 10, application of comity is appropriate. In all events, the Motion fails Rule 23, and should be denied.

## II. RELEVANT FACTUAL BACKGROUND

### A. Sears, Electrolux, and Kenmore Dryers.

Sears is a multi-line retailer in business since 1896. Wood Dec. ¶3. Kenmore is a 100-year-old, iconic Sears brand sold exclusively at Sears stores and on its website. *Id.* Key to Sears' business model is customer loyalty to its brands. *Id.* Kenmore is a valuable asset: it is an industry leader, presently accounts for approximately 1 in 5 dryers sold in the United States, and, in 2002, had 32% of the market share for dryers. *Id.* ¶4. Kenmore, moreover, is ranked in the top 5% for quality, top 4% for performance and the top 2% for trustworthiness. *Id.* ¶5. Sears does not design or manufacture Kenmore products, but purchases from manufacturers specially-made appliances to be sold under the Kenmore brand. *Id.* ¶6. The Kenmore dryers identified in the FAC and Motion were manufactured by Electrolux (the "Kenmore Dryers"). FAC ¶¶64-65; Stip. Facts at 1.

Like Sears, Electrolux has been in business for over 100 years. King Dec. ¶3. A global leader in household appliances, Electrolux manufactures innovative products that meet consumers' real needs, such as top-tier laundry products like Kenmore. *Id.* ¶¶3-4. Between 1999 and 2005, Electrolux manufactured the Kenmore Dryers identified in the FAC. *Id.* ¶¶5, 15. Electrolux also builds Frigidaire dryers, which were ***not*** part of the FAC, but which the Motion

identifies as part of the proposed class (the "Frigidaire Dryers"). *Id.* ¶4.

**1. Multiple Different Features May Be Present on Any Given Dryer.**

Any given dryer has a bundle of different features that vary within and across manufacturers, and that range from custom programming to extended cool-down, among many others. Wood Dec. ¶¶8, 13; King Dec. ¶7. Sears' buyers and manufacturers collaborate to provide the most features for the best value. Wood Dec. ¶8. The Kenmore Model 417.9105200 dryer (the "91052 Dryer") purchased by Murray offered, among other things, extra-large capacity, moisture sensing, multiple cycles and speeds, adjustable end-of-cycle signal, drying rack and stainless-steel drum. Murray Tr. at Ex. 2.

In the early 2000s, Sears retailed certain Kenmore dryers with stainless-steel drums. Wood Dec.¶18. The stainless-steel drum was primarily an aesthetic feature to complement the matching washer that included a stainless-steel tub. King Dec. ¶6. No price premium was associated with the stainless-steel feature, nor did Sears offer comparable Kenmore dryers without a stainless-steel drum. Wood Dec. ¶14.[1] And many of the higher priced Kenmore dryers continued to be offered with a painted steel drum only. *Id.*

**2. Advertising and Marketing of the Stainless-Steel Drummed Dryers.**

The Kenmore Dryers were marketed via newspaper ads, postings on sears.com, and point-of-sale ("POS") information in Sears stores, such as signs. Wood Dec. ¶9. Such advertisements are not all the same, but instead provide varying information, depending upon the purpose and limitations of a particular ad. *Compare* FAC at Ex. 6 (comparing features of three different washer/dryer combinations), *with* Oliss Dec., Ex. Q (listing briefly features and price in POS advertising). For example, during a sales campaign, ads focus on price, as opposed to particular

[1] In the *Consumer Reports* article reviewed by Murray, many dryers without stainless-steel drums were more expensive than the dryer he purchased, including two other Kenmores, because of other features. Murray Tr. at Ex. 2.

features. *See, e.g.*, Oliss Dec., Exs. R, S, T. Which specific features are identified and how they are described varies considerably. For example, dryers with stainless-steel drums were variously described as having a 'stainless-steel drum,' a 'stainless-steel drum and drum back,' a 'stainless-steel interior,' a 'stainless-steel tumbler' or simply as 'stainless steel.' FAC at Ex. 6; Oliss Dec., Exs. U, V, W, X. No advertisement of the Kenmore Dryers represented that the benefits of a stainless-steel drum included resistance to rust stains on clothing. Wood Dec. ¶16.

Some consumers may have received information directly from Sears' sales representatives. *See* Part II.C.1.[2] Sales associates are trained to emphasize products and features best suited to individual customers, such as stackable units for customers with limited laundry space. Wood Dec. ¶15. To that end, features of the Subject Dryers were briefly listed without explanation (*e.g.*, "electronic moisture sensing," "heavy duty," "large capacity," "stainless steel") on the consoles of the dryers for reference by sales associates in discussions with customers. *Id.* ¶9. Sears associates are not trained to emphasize the benefits of stainless steel, and resisting rust stains on clothing is not a feature of stainless steel that is advertised by Sears. *Id.* ¶¶15-16.

In addition, washers and dryers are frequently sold as pairs, with the washer driving the sale and the dryer as an accessory. *Id.* ¶¶10-11. Washers and dryers each come with different bundles of features. *Id.* ¶13. Generally, however, each Kenmore washer has one matching dryer: a customer wanting the exact match to her Kenmore washer has only one choice. *Id.* ¶12. While the same manufacturer builds matching Kenmore washers and dryers, in selecting its manufacturers, Sears focuses on washer features, and the dryer is secondary. *Id.* ¶11. Likewise, Sears generally emphasizes washer features to customers. *Id.* "Attachment rate," an important industry concept indicating the frequency with which Sears sells both a washer and a dryer, exceeds 80%. *Id.* ¶10. And, while the Kenmore Dryers were considerably less expensive than the matching washer,

---

[2] Of course, sales representatives often discuss other brands at the same time as Kenmore or Frigidaire dryers. Wood Dec. ¶8.

retail prices for washers and dryers vary based on promotions and sales, which sometimes reward purchasing a matching washer and dryer set. Wood Dec. ¶12.

**3. Construction of the Kenmore and Frigidaire Drum Assemblies.**

Murray's proposed class includes all California consumers who purchased the dryers "within the applicable statute of limitations for each claim," which Murray calculates as 2003 (UCL) or 2004 (CLRA). Mot. at 12-13. But the vast majority of the Kenmore Dryers sold after 2003 did not have the same design or materials as the 91052 Dryer Murray purchased in 2001. Wood Dec. ¶18. For the Kenmore Dryers built between 1999 and early 2002, like the 91052 Dryer, the drum assembly consisted of three parts: (1) a drum back that enclosed the drum in the rear; (2) the cylindrical rotating part referred to as a "wrapper" and ordinarily understood as the drum; and (3) the drum front that attached the drum and drum back to the body of the dryer with a flange on the exterior of the drum front acting as a bearing surface for the dryer's suspension system. King Dec. ¶10. In those dryers, the flange rests upon and rotates around felt and plastic glides attached to a circular ring on the door assembly. *Id.* The drum and drum back were made of stainless steel, and the drum front and flange was made of epoxy-coated, cold-rolled steel. *Id.* ¶11. The choice of cold-rolled steel was one of engineering necessity; stainless-steel was too abrasive on the dryer's suspension system and caused premature wear and failure during testing. *Id.*; Blum Tr. at 32-34, 91.[3]

Beginning in 2002, however, the suspension system of the Kenmore Dryers was redesigned. King Dec. ¶13. The glides that had been attached to the dryer door were relocated to the flange, so that the flange no longer rotated on the glides, but instead the glides rotated with the drum front. *Id.* This redesign reduced noise and also allowed Electrolux to build the drum front

---

[3] Prior to 1999, all Electrolux dryers contained a painted, cold-rolled steel drum assembly, yet rust was not a problem reported to either Sears or Electrolux. Wood Dec. ¶¶16-17; King Dec. ¶22. Rust is simply not a common problem in dryers. *See* Part II.A.4.

with galvanized steel, which eliminated the need to paint the drum front. *Id.* ¶¶13-14. Kenmore Dryers with this drum assembly were built between late 2002 and late 2005. *Id.* ¶15. Until yet another design was also introduced in 2008,[4] all stainless-steel drummed Frigidaire dryers sold at Sears were built with this redesigned assembly, not the drum assembly used in the 91052 Dryer. *Id.* ¶16.

**4. Complaints Regarding Rust in Dryer Drums Are Exceedingly Rare.**

Complaints about rust or rust stains in dryers are rare. Wood Dec. ¶¶16-17; King Dec. ¶¶21-23. Sears protects the Kenmore brand by monitoring its Kenmore manufacturers' performance. Wood Dec. ¶¶7, 17; King Dec. ¶23. Dan Pigatto, former Sears chief laundry buyer for the Kenmore Dryers, testified that any "repeated complaint[s] about the stainless steel drums of Kenmore dryers" would have been discussed at Sears' service incident rate ("SIR") meetings for those products. Pigatto Tr. at 196. SIR is a means of tracking product problems and service repairs, and Sears regards it as critical when contracting with Kenmore manufacturers. *Id.* at 193-94; Wood Dec. ¶7. Asked whether at any point from the launch of the Kenmore Dryers through 2007 he was made aware of customer concerns regarding the metallurgical construction of the dryer drums or concerns that the drums "did not deliver the level of fabric care expected from a stainless steel drummed dryer," Pigatto testified unequivocally: "never." Pigatto Tr. at 196-97.

Seeking evidence to the contrary, Murray deposed two Sears' technicians with a combined 26 years of experience, who testified that they had only responded to ***one*** service call relating to rust for a Kenmore Dryer: to service Steven Thorogood's dryer. Hess Tr. at 16-18, 49-50; Stoneking Tr. at 8. In fact, a Sears' customer service specialist testified that in 9 years of service, she knew of only one or two complaints of rust in dryers, including Thorogood. Daley Tr. at 20.

---

[4] In 2008, Electrolux changed the suspension system, allowing the drum to rotate independently and replacing the drum front and back with stationary "bulkheads." King Dec. ¶18. The drum was made of stainless steel, the front bulkhead was epoxy-coated, cold-rolled steel and the back bulkhead was stainless steel or epoxy-coated, cold-rolled steel, depending on the model. *Id.* ¶19.

**B. Plaintiff's Counsel Files Suit Against Sears In Illinois.**

In March 2006, Plaintiff's counsel filed a putative class action in state court, which Sears removed to the U.S. District Court for the Northern District of Illinois in *Steven J. Thorogood v. Sears, Roebuck and Co.* (N.D. Ill., Case No. 06-cv-1999). *Thorogood* challenged the marketing of the same Kenmore Dryers as "stainless steel" and sought certification of a 28-jurisdiction class, including California, under each state's consumer protection statutes. Oliss Dec. ¶4. In November 2007, the district court certified a 28-jurisdiction class. *Id.* ¶5.

A year later, the Seventh Circuit decertified the class, ruling that there were "*no* common issues of law or fact, so there would be no economies from class action treatment" and that "common issues of law or fact [do] not predominate over the issues particular to each purchase and purchaser of a 'stainless steel' Kenmore dryer." *Thorogood I*, 547 F.3d at 746-47 (emph. in orig.). In an effort to end the litigation, Sears offered judgment on Thorogood's individual claim in the amount of $20,000, and when Plaintiff's counsel refused, the district court dismissed the case. *Thorogood II*, 547 F.3d at 752. The Seventh Circuit affirmed, labeled the case a "flop" and a "nuisance suit costly to defend against," and gave Plaintiff's counsel a fee of "$0." *Id.* at 753-54.

**C. Plaintiff's Counsel Files Suit Against Sears And Electrolux In California.**

After decertification in *Thorogood*, Plaintiff's counsel found a new plaintiff – Murray – and filed a "copycat suit in California," which Defendants removed to this Court. *Thorogood III*, 624 F.3d at 844. In his FAC, Murray, a member of the failed *Thorogood* class, alleges that Defendants falsely advertised the Kenmore Dryers as having a stainless-steel drum that would not rust, chip or stain or damage clothes even though a part of the drum assembly was not stainless steel and caused rust stains on clothing. FAC ¶¶22-23, 33-79. Murray also alleges that, as a result of Defendants' purportedly misleading practices, he bought a dryer that ultimately rusted and damaged his clothing. *Id.* ¶¶64-79; Mot. at 4-6. Murray seeks to represent a class of all California

purchasers of the Kenmore Dryers, as well as the Frigidaire Dryers, despite the fact that Murray never purchased a Frigidaire Dryer nor identified any Frigidaire Dryers in his FAC. *Compare* Mot. at 11, *and* Boling Dec. ¶13, *with* FAC ¶¶22, 84.

**1. Murray Purchases a Kenmore Dryer from Sears.**

In September 2001, Murray purchased his Kenmore 91052 Dryer from a Sears store in San Bruno, California. FAC ¶¶64-69. Murray and his wife went to Sears to take advantage of a sale to replace their leaking washing machine, and chose to purchase a matching dryer at the same time because a matching set was important to Murray's wife. Murray Tr. at 37-38, 71-74.

Prior to visiting Sears, Murray read a *Consumer Reports* article containing information on various features and performance of washers and dryers, including the 91052 Dryer. *Id.* at 80-94 & Ex. 2. It listed the advantages of front-load washers and machines designed for small spaces; gave information on dryers, including the moisture sensor, touchscreen features, adjustable end-of-cycle signaling, custom programming, drying racks, porcelain tops, stainless-steel drums, drum capacity, noise and convenience. *Id.* at Ex. 2. Murray stated some information was important to him (*i.e.*, repair history, moisture sensor and stainless-steel drum), but some was not (*i.e.*, space considerations, custom programming and touchpad controls). *Id.* at 82-86. Of primary interest to Murray's wife was purchasing a matching washer and dryer set, and ease of use. *Id.* at 86-87.

Based on his research and discussions with his wife, Murray decided to buy a front-load washer-and-dryer set. *Id.* at 87-88. The Murrays went to Sears and asked sales representative John Seale to help them choose a front-load washer and matching dryer. *Id.* at 74. Seale showed them washer-and-dryer sets of different brands and discussed their various features, as well as availability, delivery and installation. *Id.* at 77-78, 105-13. Seale allegedly recommended stainless steel in both washers and dryers, telling the Murrays that a stainless-steel washer tub or dryer drum would not chip, rust, corrode or stain or damage clothes. *Id.* at 107, 110-11. Specifically,

Seale indicated that metal buttons and coins might chip or scratch other tubs or drums, causing rust. *Id.* at 111. He opened several dryers' doors to show the Murrays the interiors. *Id.* at 122-27. When looking inside, Murray observed that some portions of the interiors were stainless steel but others were not. *Id.* Based upon his discussion with Seale and the *Consumer Reports* article,[5] Murray purchased the matching washer and 91052 Dryer. FAC ¶¶64-69.

**2. Murray Allegedly Experiences Problems with His Dryer.**

By 2003 or 2004, Murray noticed stains on items dried in the dryer. Murray Tr. at 137-38. In 2007, in addition to staining, Murray noticed small tears on items dried in the dryer. *Id.* at 141.[6] Murray investigated, running a cloth around the inside of the dryer and noticing that the drum was "loose," so that when he pushed on the drum a gap appeared between the front of the dryer and the drum, purportedly allowing laundry to fit in the gap. *Id.* at 143. Murray removed the dryer front – known as the door assembly – which includes a circular ring attached to the dryer door, upon which a felt strip and three plastic glides are adhered, and on which the flange of the outer part of the drum assembly (*i.e.*, the drum assembly's bearing surface) rests and around which it rotates. *Id.* at 142-46 & Exs. 10-12; *see* Part II.A.3. Murray alleges that he observed a red-brown stain resembling rust on the felt and that the plastic glides had worn. Murray Tr. at 154-57 & Exs. 10-12. He also observed that the drum front was painted steel, and that a small spot on the exterior flange of the drum front had rusted and that this rust had transferred to the felt around the bearing surface of the door assembly. *Id.* at 160-61 & Exs. 6-9.

---

[5] *Consumer Reports* also stated that stainless steel "likely resists damage better than plastic and porcelain versions," which Murray interpreted as not rusting or damaging the drum or clothing placed in it. Murray Tr. at 90-92 & Ex. 2. Murray, however, had never experienced rust in any dryer, and he believed that all portions of every dryer were rust and corrosion resistant as long as they were not damaged. *Id.* at 44, 128-30. He admits that different consumers may interpret a phrase such as "resists damage" differently. *Id.* at 90-92.

[6] Murray, a lawyer, claims he preserved a bag of damaged items, but produced a single t-shirt, which had several different stains. Murray Tr. at 59-60. ***Three separate chemical analyses*** ordered by Murray's expert, Lisa Thomas, concluded that the staining was ***not*** rust. Thomas Tr. at 29-34, 54-55, 79-80, 89, 102-03, 109-10, 122, 126-27. The results of those tests were omitted from Thomas's expert declaration, however. *Id.* at 72-73.

Murray admits that the interior of his drum – where the laundry goes – showed no signs of rust, corrosion, chipping or staining, Murray Tr. at 16-17, 228-33; Thomas Tr. at 246-47, and that the alleged stains and tears likely resulted from the loosened drum, allowing laundry to become caught in the gap between the drum and the door and to touch the allegedly rusty felt. Thomas Rep. ¶¶5-8. There is no proof, however, that a loose drum or resulting staining or tearing are common or have been experienced by any other class member. Thomas Tr. at 234-43.[7]

Murray ordered replacement felt and glides and repaired his dryer. Murray Tr. at 182-84. Afterward, the drum assembly did not seem to be loose and functioned fine, for some 12-18 months. *Id.* at 184. Murray alleges that, by 2009, he again experienced staining and tearing of laundry in the dryer. *Id.* at 185-86. After finding that the drum had again loosened, he ordered new felt and glides, bought "Appliance Epoxy," and tried to repair the drum by painting the alleged rusty spot on the exterior flange and again replacing the felt and glides on the assembly. *Id.* at 190-91. Murray alleges he noticed staining and tearing of his clothes 6 months later, yet he continued using his dryer until July 2010 (8 months *after* filing this lawsuit) when his attorneys asked that he turn it over to their expert. *Id.* at 195. He had not replaced the dryer because keeping a matching set was important to his wife and he did not want to also buy a washer. *Id.* at 195-96.

## III. <u>ARGUMENT</u>

### A. This Court Should Show Comity Toward *Thorogood I*.

The party seeking class certification "must ***affirmatively*** demonstrate" through competent evidence, "compliance with" Rule 23, and this Court must make any findings necessary to determine whether this burden has been satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011). This "rigorous analysis," *id.*, does not start on a clean slate. This case is a "copycat,"

---

[7] Murray's dryer has a different suspension system than the majority of the dryers purchased by the class, and there is no proof that any of those dryers experienced the same alleged problem. *See* Part II.A.3-4; *see also* Thomas Tr. at 99, 186, 249-50.

*Thorogood III*, 624 F.3d at 844; *Thorogood IV*, 678 F.3d at 552, which was seemingly filed in "deliberate maneuvering to avoid the effects of [denial of class certification in] *Thorogood*." Order Gr. Mot. to Strike at 10. Two lawsuits could not be more closely intertwined: their allegations and claims are substantially similar (Murray incorporates *Thorogood's* complaint into his FAC), Plaintiff's counsel is the same, and Murray relies upon membership in the *Thorogood* class, hoping to toll the statutes of limitation on his expired claims. Mot. at 6, 13.

A unanimous Supreme Court has recently stated that it "expect[s] federal courts to apply principles of comity to each other's class certification decisions when addressing a common dispute," *Smith*, 131 S.Ct. at 2382, and, in lifting the injunction on this case, the Seventh Circuit emphasized that "[w]e unsay nothing we said in [*Thorogood I*, *II* and *III*]" and advised Defendants that comity remained a basis for obtaining "relief from this copycat class action." *Thorogood IV*, 678 F.3d at 550, 552 (applying *Smith*). Other courts have followed *Smith*. In *Baker v. Microsoft Corp.*, 851 F. Supp. 2d 1274 (W.D. Wash. 2012), plaintiffs filed a second federal class action after a federal ruling denying class certification. Applying *Smith*, the second court ruled that "'denial of class certification should raise a rebuttable presumption against the same aggregate treatment in another court,'" and denied certification. *Id.* at 1278, quoting PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 2.11, at 179 (2010); *see Edwards v. Zenimax Media, Inc.*, 2012 U.S. Dist. LEXIS 137520, *10-11 (D. Colo. 2012) (following *Smith*, ruling that a prior federal denial of class certification was "highly persuasive and relevant to the resolution of [class allegations]," and ultimately striking the class allegations).

This Court should likewise show comity to *Thorogood I*'s holding that the proposed class presents neither common questions of fact or law nor predominance of such questions over individualized ones. *Thorogood I*, 547 F.3d at 746-48.[8] Despite Murray's excessive discovery

---

[8] The Supreme Court apparently had *Thorogood* in mind. *Smith* concerned a federal injunction of

requests, 17 depositions, Defendants' production of 6,487 additional pages of documents, Oliss Dec. ¶¶7-8, and a promise to do so, Opp. to Str. FAC Class Cl. at *passim*, ***Murray has adduced no additional evidence not already present (and found insufficient) in*** **Thorogood** to show the existence of commonality, much less predominance.[9] *See* Parts III.B.1 & III.C.1.

The *Thorogood* Court's reasoning remains valid here, as Murray has done ***nothing*** to rebut that court's conclusions that rust stains were not a "common concern" for consumers, that consumers buy stainless-steel appliances for aesthetic reasons, that "[s]tainless steel clothes dryers are not advertised as preventing rust stains on clothes," and that "the proposition that the other half million buyers, apart from Thorogood, shared his understanding of Sears's representations and paid a premium to avoid rust stains is, to put it mildly, implausible, and so would require individual hearings to verify." *Thorogood I*, 547 F.3d at 747-48. Murray has shown no common proof that rust stains are a classwide problem in the Subject Dryers, or that class members were exposed to common representations and understood them in the same way that he did. *See* Part III.B.1. Moreover, Murray's claims present new typicality and adequacy problems, such as defenses based upon standing and limitations. *See* Part III.B.2. As such, this case remains "a notably weak candidate for class treatment" with "***no*** common issues of law or fact, [and] no economies from class action treatment." *Thorogood I*, 547 F.3d at 746-47 (emph. in orig.).

**B. Murray Cannot Satisfy The Prerequisites Of Rule 23(a).**

**1. Murray Has Shown No Common Questions of Law or Fact.**

Commonality "requires the plaintiff to demonstrate that the class members have suffered

---

a state court class action based on denial of certification by the federal court. At oral argument, Justice Breyer asked whether "in a Federal court a judge in the district court said, no, you can't have a certification, no; and then a different plaintiff went to a different Federal court in a different part of the country and asked for a similar certification," and was told that *Thorogood* was that case. Tr. of Oral Arg. in *Smith* at 24. With this backdrop, the Court stated that it "expect[ed]" federal courts to show comity to class certification rulings. *Smith*, 131 S.Ct. at 2382.

[9] As Murray admits, "class certification now requires greater scrutiny on the merits based on the *Walmart v. Dukes* decision," than was the case in *Thorogood*. Opp. to Ext. of Time at 4.

the same injury" that "depend[s] upon a common contention," the truth or falsity of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S.Ct. at 2551. Murray seeks to certify a class of California purchasers of the Subject Dryers, which, he alleges, "have a non-stainless [steel] interior drum face that eventually rusts in normal use and stains the clothing of California consumers who use these laundry dryers." Mot. at 1.[10] But Murray can point to no common injury that is susceptible to classwide proof.

**a. There is no evidence of a common injury.**

There is no evidence that class members suffered ***any injury***, let alone a ***common injury*** as required by *Dukes*. *Dukes*, 131 S.Ct. at 2551; *Sanchez v. Wal-Mart Stores, Inc.*, 2009 U.S. Dist. LEXIS 48428, *6 (E.D. Cal. 2009) ("When fact of injury cannot be established through classwide proof, class certification is improper"). Rust is not a common problem for dryer drums, whether constructed of stainless steel or otherwise. King Dec. ¶21; Wood Dec. ¶¶16-17; King Tr. at 160; *Thorogood I*, 547 F.3d at 747 ("It is not as if rust stains were a common concern of owners of clothes dryers."). Numerous knowledgeable witnesses – service technicians, customer service personnel, laundry buyers and engineers – testified unequivocally that, apart from the allegations of Murray and Thorogood, they had ***never*** heard of a problem of rust in the stainless-steel dryer drums. King Dec. ¶¶20-23; Wood Dec. ¶¶16-17; Daley Tr. at 20, 61-62, 66; Hess Tr. at 16, 49-50; Pigatto Tr. at 96-97, 196-97; King Tr. at 160; Ripley Tr. at 75; Wood Tr. at 113.

The injury complained of by Murray is unique. *In re Toyota Motor Corp. Hybrid Brake Mktg.*, 2013 U.S. Dist. LEXIS 4295, *19 (C.D. Cal. 2013). Murray alleges not that the interior of the drum rusted, but that the flange on the exterior of his dryer drum front wore and rusted, and that the rust transferred to the felt on the door assembly, which then transferred rust to clothes that came into contact with the felt due to the fact that his drum was loose. Thomas Rep. ¶¶5-8. But

[10] Murray testified that his case is ***not*** based upon claims regarding chipping, scratching, drum staining or dye transfer of the stainless-steel drums. Murray Tr. at 16-17, 228-32.

his expert conceded that various individual factors may have contributed to the failure of Murray's dryer, and that she has no basis to compare Murray's use of his dryer to normal use, as Murray's was the only dryer she examined.[11] Indeed, neither Murray, Thorogood, nor Murray's own expert knew of ***any*** consumer with an experience akin to Murray's or Thorogood's. Murray Tr. at 45-46, 173, 237-38; Thorogood Tr. at 117-18; Thomas Tr. at 186, 235.[12] Moreover, there is ***no*** evidence that the drums in the Kenmore and Frigidaire dryers with a galvanized steel front, which represent the dryers purchased by 99% of the proposed class, King Dec. ¶¶12-16; Wood Dec. ¶18, wear, rust or damage consumers' clothing. King Dec. ¶¶24-26; King Tr. at 160; Ripley Tr. at 75. Murray's own expert again concedes the point, testifying that the Kenmore Dryers with cold-rolled drum fronts and galvanized drum fronts "[a]re two entirely different animals" and will not experience "the same type of wear." Thomas Tr. at 277; *see Johnson v. Harley-Davidson Motor Co.*, 2012 U.S. Dist. LEXIS 72048, *13-14 (E.D. Cal. 2012) (no commonality where "class vehicles do not have a uniform design across the different models").

Moreover Murray has produced no evidence that his clothing was damaged by the 91052 Dryer, let alone any evidence that the class's clothing has or will be damaged by their dryers. The ***sole*** garment sample retained by Murray had only "weak presence of iron" and ***each of the three, separately conducted chemical analyses*** of that clothing tested ***negative*** for rust, a fact

[11] Thomas admits that individualized factors (*e.g.*, drying load weight, abrasive matter in the dryer, number and frequency of drying cycles, and wet clothing left inside the dryer) can affect wear and corrosion, but made no effort to determine a typical consumer's usage. Thomas Tr. at 222-25, 228-32. Nor did she learn anything about Murray's use of his dryer, or even account for a visible, unknown particulate matter (possibly sand) in his dryer. *Id.* at 43-44, 207, 223, 226-28, 302.

[12] Apart from his purported expert's bald declaration that rust is endemic to the Subject Dryers with a cold-rolled steel drum front, Murray has adduced ***no*** proof that the purported problem with the 91052 Dryer is common to the proposed class. Thomas Rep. ¶21(D); Thomas Errata ¶(D); Thomas Tr. at 234-41. "[F]indings must be made based on adequate admissible evidence to justify class certification," *Unger v. Amedisys, Inc.*, 401 F.3d 316, 319 (5th Cir. 2005); *accord Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011), and Internet postings are inadmissible, wholly unreliable hearsay. *Adams v. Albertson*, 2012 U.S. Dist. LEXIS 50904, *6 (N.D. Cal. 2012). Because Thomas's report contains numerous errors and baseless allegations, does not comport with the scientific method, and is unreliable, the Court should not consider it.

conveniently omitted from Murray's expert report. Thomas Tr. at 29-34, 54-55, 72-73, 79-80, 89, 102-03, 109-10, 122, 126-27.[13]

**b. There is no common misrepresentation as to the stainless-steel drum.**

Murray alleges that Defendants misrepresented the Subject Dryers as "stainless steel" by not informing consumers that the drum front is not stainless steel and, according to Murray, the exterior flange on the drum front will wear, rust and eventually stain clothes. Mot. at 2, 4, 7, 14. The record, however, is empty of common representations that the Subject Dryers' entire drum assembly was 100% stainless steel or that the advertised benefits of "stainless steel" include preventing rust damage to clothes. *Knapp v. AT&T Wireless Servs., Inc.*, 195 Cal. App. 4th 932, 943-46 (4th Dist. 2011) (affirming denial of class certification when there were no common representations to the class).

The content of ads or printed/electronic representation regarding the Subject Dryers varied. Hargrave Tr. at 82; Christiansen Tr. at 96-98 (POS signage provides limited space and contains only a "very basic description"); *see* Part II.A.2. Individual Sears stores' ads for the Subject Dryers varied, as would individual representations made by Sears' sales associates. Pigatto Tr. at 180-81; Wood Dec. ¶15. Notably, most of the information Murray received regarding the stainless-steel feature came from the sales associate and viewing the words "stainless steel" on the console of the 91052 Dryer. Mot. at 4; FAC ¶¶65-66. No one told him that

[13] Murray claims the 91052 Dryer "was more expensive than the other ones" he considered, but there has no proof that he or any class member paid a premium for a stainless-steel drum. Murray Tr. at 115-17, 122 (admitting that stainless steel was one of many features of the 91052 Dryer, that Murray "do[es]n't know how Sears prices their products," that he cannot recall the alleged premium he paid, and that he cannot recall differences in features as between the 91052 Dryer and other, cheaper dryers he considered); Pigatto Tr. at 176. The consumer pays for a ***bundle*** of features, not any single feature in isolation. Wood Dec. ¶¶8, 14; Pigatto Tr. at 175-79; Wood Tr. at 42-45. In fact, the evidence shows that Sears was able to obtain from Electrolux "the stainless steel drum in this case as a competitive advantage at no additional cost," which enabled Sears to sell the Kenmore Dryers "at no extra cost." Pigatto Tr. at 55, 77, 177; Wood Tr. at 37-41. Nor does the fact that stainless steel costs more as raw material than cold-rolled or galvanized steel mean that manufacturing costs, much less retail price, will be higher. King Dec. ¶28; King Tr. at 64.

the entire drum assembly was composed of stainless steel, Murray Tr. at 125-27,[14] and he saw nothing in printed form representing that the Kenmore Dryers resist rust stains on clothing. *Id.* at 245-46. There is no evidence that members of the class would have received the same information. Wood Dec. ¶15 (sales associates were not trained to emphasize the stainless-steel drum to customers); Murray Tr. at 97-98 (Murray did not remember any POS card contained representations regarding the composition of the drum assembly or rust resistance); *see Knapp*, 195 Cal. App. 4th at 943-46; Kivetz Rep. ¶¶17-33.

Nor is there any evidence that consumers would have interpreted the information regarding the Subject Dryers in a common manner. Kivetz Rep. ¶¶ 35-53. Murray personally interpreted "stainless steel" to mean impregnable against rust "forever," though he concedes that other consumers could interpret the term differently. Murray Tr. at 92, 130; *see Thorogood I*, 547 F.3d at 747 ("Each class member … will have to testify to what he understands to be the meaning of a label or advertisement that identifies a clothes dryer as containing a stainless steel drum.").[15] Attempting to cure this, Plaintiff's counsel heavily relies upon a product page from Sears.com (which Murray admits he never saw) for his claim that Defendants advertised the stainless-steel drums as "eliminat[ing] rusting." Christiansen Tr. at 35-56; Hargrave Tr. at 48-66, 73; Jergens Tr. at 184-93; King Tr. at 185; Roth Tr. at 101-03. Yet, the dryer on that page was ***not*** manufactured by Electrolux and is ***not*** one of the Subject Dryers, Jergens Tr. at 187, 193; King Tr. at 185; Roth Tr. at 103; *see also* Mot. at 2 (attributing representation to "***other*** laundry dryers").

Based on Murray's personal allegations, the only common representation by Defendants

[14] The front flange is part of the drum assembly's suspension system, not the drum itself. Hess Tr. at 20-22; Stoneking Tr. at 16-18; Blum Tr. at 8; Jergens Tr. at 95-96, 105-06, 204-05; King Tr. at 46; Ripley Tr. at 23-25. Murray's expert agrees: "drum" refers "to the drum wrapper." Thomas Tr. at 212. The drum assembly had other non-stainless-steel parts readily apparent to consumers (specifically including Murray): namely, the plastic fins attached to the interior of the drum. Blum Tr. at 29; Murray Tr. at 123-25.

[15] It is undisputed that, under certain circumstances, stainless steel can rust. Thomas Tr. at 192; Ripley Tr. at 70. Murray's belief that stainless steel will resist rust in perpetuity is unreasonable.

regarding the dryer drum consists of the words "Stainless Steel" printed on the Kenmore Dryers' consoles – the same evidence that Murray acknowledges was too weak to support class certification in *Thorogood*. Opp. to Str. Class Cl. at 28; *see Thorogood I*, 547 F.3d at *passim*.

**2. Murray Is Not a Typical or Adequate Representative of His Proposed Class.**

The requirements of Rule 23(a) "ensure[] that the named plaintiffs are appropriate representatives of the class." *Dukes*, 131 S.Ct. at 2550. But where the named plaintiff's claims result from conduct unique to him and are subject to unique defenses, he is atypical of and inadequate to represent the class. *Hanon v. Dataproducts*, 976 F.2d 497, 508 (9th Cir. 1992).

**a. Murray's dryer differs from that of other class members.**

Murray is not typical of or adequate to represent the class because he is not a member of it. *Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147, 156 (1982). He purchased his 91052 Dryer in September 2001, but seeks to represent a class that purchased Subject Dryers after March 2003 and March 2004. Mot. at 12-13. In addition, Electrolux redesigned the Subject Dryers' suspension system in 2002, and the majority of the proposed class purchased dryers with a ***different design*** from the 91052 Dryer. King Dec. ¶¶12-16; Wood Dec. ¶18. The majority of the Subject Dryers sold during the proposed class period contained a suspension system in which the glides were attached to the flange directly, rather than having the flange rotate on glides attached to the door assembly. *Id.*; King Dec. ¶¶12-15. As such, Murray's claims are atypical. *Gonzalez v. P&G Co.*, 247 F.R.D. 616, 622 (S.D. Cal. 2007).

Moreover, evidence required to prove that Murray's dryer rusted because its front flange was not made of stainless steel will not be probative of other class members' claims. *Wiener v. Dannon Co.*, 255 F.R.D. 658, 665 (C.D. Cal. 2009). Murray claims that friction caused by the flange rotating on the plastic glides wore away the flange's epoxy coating, exposing the steel and causing it to rust, and that this rust passed to the felt and then to clothing. Thomas Rep. ¶¶5-8. But

there is no evidence that this alleged failure is common to other, similar dryers. *See* Part III.B.1.a. Moreover the design of dryers manufactured after 2002 would eliminate any such problem, because it eliminates friction between the flange and glides. King Dec. ¶¶24-26. Further, the post-2002 dryers have a galvanized steel drum front. *Id.* ¶14. There is no evidence at all that the failed mechanism in Murray's dryer could also occur in the redesigned models. Murray's expert disclaims any such opinion[16] and admits that galvanized steel corrodes differently than carbon steel, producing zinc oxide, not rust. Thomas Rep. ¶16; Thomas Tr. at 283. There is ***no*** evidence that zinc oxide damages clothing, as Murray's expert also admits. Thomas Tr. at 283-84. Thus, resolving Murray's claim will not implicate whether the dryers bought by the vast majority of class members damage clothes because the drum fronts were not stainless steel. *Wiener*, 255 F.R.D. at 665.

**b. Murray is subject to unique defenses.**

"[C]ertification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon*, 976 F.2d at 508; 5 MOORE'S FEDERAL PRACTICE-CIVIL § 23.24[5] (3d ed. 1997) ("The opposing party is not required to prove a defense.… [but] must show some degree of likelihood that a unique defense will play a significant role at trial."). Several defenses to Murray's claims would likely become the focus of the litigation. *Mateo v. V.F. Corp.*, 2009 U.S. Dist. LEXIS 105921, *11-12 (N.D. Cal. 2009).

***First***, Murray never purchased a Frigidaire Dryer, and therefore cannot have been deceived by representations regarding them or suffered any injury as a result. FAC ¶¶64-79; *see Carrea v. Dreyer's Grand Ice Cream, Inc.*, 2011 U.S. Dist. LEXIS 6371, *3-4 (N.D. Cal. 2011). Murray thus lacks standing to pursue claims against Defendants regarding Frigidaire Dryers.

[16] Murray's expert revised her December 12, 2012 declaration with an errata filed on December 18, 2012, to eliminate any such suggestion. *Compare* Thomas Rep. ¶21(D), *with* Thomas Errata ¶(D). She did so "[b]ecause I didn't feel that – that I could – that I could state that galvanized steel will wear, because I really honestly don't know." Thomas Tr. at 99.

*Mlejnecky v. Olympus Imaging Am., Inc.*, 2011 U.S. Dist. LEXIS 42333, *4 (E.D. Cal. 2011); *Johns v. Bayer Corp.*, 2010 U.S. Dist. LEXIS 10926, *13 (S.D. Cal. 2010) (plaintiff "cannot expand the scope of his claims to include a product he did not purchase").

***Second***, "a plaintiff seeking equitable relief must further demonstrate a likelihood of future injury. This requires a showing that plaintiff is realistically threatened by a repetition of the violation." *Wang v. OCZ Tech. Group, Inc.*, 276 F.R.D. 618, 626 (N.D. Cal. 2011). Murray avers he does not intend to purchase another dryer with a stainless-steel drum from Sears. Murray Tr. at 217-18. Moreover, the specific Kenmore Dryers manufactured by Electrolux and purchased by Murray are no longer sold by Sears. Wood Dec. ¶18. Accordingly, there is no risk of future harm to Murray, and his request for an injunction is moot. *Wang*, 276 F.R.D. at 626.

***Third***, Murray is subject to a statute of limitations defense. He purchased his dryer in September 2001, FAC ¶64, the limitations period is 3 years for the CLRA and unjust enrichment (ending in September 2004) and 4 years for the UCL and breach of contract (ending in September 2005). Cal. Civ. Code § 1783; Cal. Bus. & Prof. Code § 17208; Cal. Code Civ. P. §§ 337, 338. To revive his expired claims, Murray claims the "discovery rule" delays their accrual, arguing that his claims did not commence until June 8, 2007, when he disassembled his dryer and determined that the flange was not stainless steel. Mot. at 15. Such bare assertions are questionable at best.

Since "the delayed discovery rule does not apply to actions brought under the UCL," *Keilholtz v. Super. Fireplace Co.*, 2009 U.S. Dist. LEXIS 30732, *18 (N.D. Cal. 2009), Murray's UCL claim expired in September 2005. Further, to invoke the delayed discovery rule as to his other claims, he must prove that, despite reasonable diligence, he could not discover facts supporting his claims during the limitations period. *Briosos v. Wells Fargo Bank*, 2011 U.S. Dist. LEXIS 48569, *15 (N.D. Cal. 2011). Murray cannot do so, for he admits noticing clothes stains within a few years of buying the dryer (*i.e.*, 2003 or 2004), ***but did nothing to investigate their***

***source***. Murray Tr. at 137-39; *Doe v. Roman Catholic Bishop of Sacramento*, 189 Cal. App. 4th 1423, 1431-34 (3d Dist. 2010) (plaintiffs must "conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation").

Had Murray exercised diligence in 2003 or 2004, he would have discovered then what he alleges he discovered in 2007 when he finally investigated the alleged staining, FAC ¶¶75-76, and he admits that rust stains on his clothing should have put him on notice. *Id.* ¶68; Mot. at 15 ("Not until the drum front wears and Murray's clothes were stained from the rust [ ] did Murray suspect or become aware of the misrepresentations, injury and the existence of a claim for relief."). Because he did not investigate the staining for several years, he cannot delay accrual of his claims until 2007. *Doe*, 189 Cal. App. 4th at 1431-34. At best, Murray's claims accrued in 2003 or 2004, meaning that his CLRA and unjust enrichment claims expired in 2006 or 2007 and his contract claim expired in 2007 or 2008 – at least a year (or more) before Murray filed suit.

Nor are Murray's claims tolled under the equitable tolling doctrine in *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974). Mot. at 13. Under equitable tolling, "the filing of a class action toll[s] the applicable statute of limitations for all asserted members of the class." *Robbin v. Fluor Corp.*, 835 F.2d 213, 214 (9th Cir. 1987). This narrow doctrine can only be invoked by members of the previously-filed class and is only applicable to claims asserted in and by parties to that case. *Williams v. Boeing Co.*, 517 F.3d 1120, 1136 (9th Cir. 2008) ("[T]he tolling rule does not leave[] a plaintiff free to raise different or peripheral claims following denial of class status."); *Haugh v. Depuy-Motech, Inc.*, 14 Fed. Appx. 883, 886 (9th Cir. 2001) (denying tolling where prior class action had different defendants); *Madani v. Shell Oil Co.*, 2008 U.S. Dist. LEXIS 114535, *10-15 (C.D. Cal. 2008) (once claims were excluded from prior case, class members were not entitled to tolling). Equitable tolling is limited to ***individual claims*** and is unavailable to

plaintiffs attempting to assert ***subsequent class claims*** to cure deficiencies in a previously-rejected class. *Robbin*, 835 F.2d at 214; *Kreek v. Wells Fargo & Co.*, 652 F. Supp. 2d 1053, 1060-62 (N.D. Cal. 2009). Thus, equitable tolling would not apply to Murray's (1) breach and unjust enrichment claims, which were not class claims in *Thorogood*; (2) claims against Electrolux, which was not a party to *Thorogood*; (3) claims regarding Frigidaire Dryers, which were not in the *Thorogood* class; and (4) his class claims. In short, the timeliness of Murray's claims will undoubtedly become a central focus of the litigation to the class's detriment.

### C. Murray Cannot Satisfy The Requirements Of Rule 23(b)(3).[17]

#### 1. Common Questions of Law or Fact Do Not Predominate.

Because Murray cannot satisfy commonality, *a fortiori* he cannot show predominance. But even if, *arguendo*, Murray could show commonality, he still cannot satisfy the "far more demanding" predominance standard. *Amchem Prods. v. Windsor*, 521 U.S. 591, 623-24 (1997).

##### a. Reliance cannot be presumed, and individual issues will predominate.

Because he has ***no proof*** that class members relied on the scant representations allegedly made by Defendants, Murray insists repeatedly that this Court can presume reliance for his CLRA and UCL claims, citing *In re Tobacco II Cases*, 46 Cal. 4th 298 (2009). Mot. at 1 n.1, 2 n.2, 7 n.7, 9, 18 & n.23, 20-21. This assertion was rejected in *Thorogood*, and is contrary to California law and *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012). In *Mazza*, the Ninth Circuit decertified CLRA and UCL claims of misrepresentations and omissions in the marketing of certain vehicles, rejecting a presumption of reliance since "class members were exposed to quite

[17] Murray seeks certification for injunctive relief under Rule 23(b)(2). Mot. at 16. But "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant. Nor does it apply when each class member would be entitled to an individualized award of monetary damages." *Dukes*, 131 S.Ct. at 2557. Murray is not personally entitled to injunctive relief, and the evidence shows individualized facts preclude injunctive relief. Sears also no longer sells the Kenmore Dryers, Wood Dec. ¶18, mooting any need for injunctive relief.

disparate information from various representatives of the defendant," and "the limited scope of that advertising makes it unreasonable to assume that all class members viewed it." *Id.* at 596. The Ninth Circuit distinguished *Tobacco II* as stemming from "a 'decades-long' tobacco advertising campaign where there was little doubt that almost every class member had been exposed to defendants' misleading statements." *Id.* The *Mazza* ads – TV commercials, brochures, magazine ads, dealership video kiosks, website videos, and owner's manual, *id.* at 586-87 – "f[e]ll short of the extensive and long-term [fraudulent] advertising campaign at issue in *Tobacco II*." *Id.* at 596.

Defendants' alleged representations are several degrees of magnitude ***smaller*** than those of *Mazza* in both kind and volume, to say nothing of *Tobacco II*. *See* Part III.B.1. If the representations in *Mazza* required individualized inquiry, Murray's claims cannot be otherwise. *Mazza*, 666 F.3d at 595-96; *Cohen v. DirectTV, Inc.*, 178 Cal. App. 4th 966, 981 (2d Dist. 2009); *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 133-34 (2d Dist. 2009); *see* Kivetz Rep. ¶¶17-33.

**b. Materiality will require individual inquiries.**

The CLRA requires proof of actual injury caused by an unlawful practice, where causation is "commonly proved more likely than not by materiality." *Edwards v. Ford Motor Co.*, 2012 U.S. Dist. LEXIS 81330, *23 (S.D. Cal. 2012). "[I]f the issue of materiality or reliance is a matter that would vary from consumer to consumer, the issue is not subject to common proof, and the action is properly not certified as a class action." *Id.* at *24, quoting *Vioxx*, 180 Cal. App. 4th at 128. Murray repeatedly claims that Defendants' alleged representations are "material," Mot. at 1, 4-5, 7-11, 14-15, 17, 20-21, 23, and urges this Court to presume materiality, *id.* at 19 & n.24. But he produces no evidence that materiality can be proven on a classwide basis, and acknowledges that different consumers will likely have varying approaches to, and various considerations in, buying appliances. Murray Tr. at 78, 82-83.

Moreover, Defendants' expert, Dr. Ran Kivetz, provides undisputed testimony[18] that the significance of any representations regarding the Subject Dryers' stainless-steel drums would "var[y] from consumer to consumer such that the reasonable consumer standard cannot be applied on a classwide basis." *Edwards*, 2012 U.S. Dist. LEXIS 81330 at *25. Dr. Kivetz explains that, for most, a dryer purchase is principally motivated by factors unrelated to drum composition:

- Dryer purchases are primarily driven by the purchase of washers, along with consumers' desire for a matching washer/dryer set, Kivetz Rep. ¶¶59-62; *accord* Wood Dec. ¶¶10-11; Pigatto Tr. 168-69 (stating that "a dryer is an accessory to a washer");
- Dryer sales are not commonly driven by individual features, some consumers being more concerned with brand name and reputation, consumers' past experiences and price, Kivetz Rep. ¶¶63-75; *accord* Wood Dec. ¶11; and
- The importance of individual dryer features varies, the most prized feature tends to be drying capacity, followed by moisture sensors, temperature management, and fabric settings, Kivetz Rep. ¶¶76-85; *accord* Pigatto Tr. at 181-83 (capacity and temperature management). The dryer drum's composition is generally not a significant consideration across all consumers, Kivetz Rep. ¶¶86-121.

Notably, Murray admits that his dryer purchase was driven by the washer: "Mr. Seale[] approached us and asked us what we were looking for. I told him I was looking for a front-loading washer, matching dryer." Murray Tr. at 74. Buying a matching set was critical to his wife; Murray purchased a matching set; and he admits he "would only have bought [another dryer] if it matched the washer." *Id.* at 37-38, 72, 74, 86-87, 115. Kenmore was familiar to Murray, he had earlier bought a matching Kenmore washer/dryer. *Id.* at 44-45. And the composition of the dryer drum appeared to be almost unimportant to Murray. When asked what mattered to him at the time of purchase, Murray stated:

> I wanted a front-loading washer. I wanted one that was economical on both electricity and hot water. For the dryer, I think *Consumer Reports* recommended getting one with a moisture sensor as opposed to simply a thermostat.

*Id.* at 77; *see id.* at 86 (testifying that he did not know whether his wife had wanted a dryer with a

---

[18] Dr. Kivetz report is being filed contemporaneously. Murray has introduced no evidence regarding consumer behavior. Thomas Rep. at 1 & ¶¶1-2; Thomas Tr. at 295 (Plaintiff's counsel stating that expert was "not here to testify about marketing").

stainless-steel drum); Part II.A.2. Stainless steel was never material even to him: he does not recall whether the dryer he owned prior to the 91052 Dryer or whether the dryer loaned to him by his attorneys after they removed his 91052 Dryer contained a stainless-steel drum. Murray Tr. at 31-32, 44. Finally, Murray's ***current*** dryer does ***not*** contain a stainless-steel drum. *Id.* at 33.

Murray's "own behavior belies any claim" that all members of the class would find a stainless-steel drum material to their purchase of a dryer. *Edwards*, 2012 U.S. Dist. LEXIS 81330, *30-31. Materiality will require individual determinations, and class treatment is improper. Kivetz Rep. ¶¶116-121; *see Johnson*, 2012 U.S. Dist. LEXIS 72048, *15 ("materiality is not an issue subject to common, rather than individualized proof" where "[d]efendants offer persuasive evidence that the excessive heat would not be material to many of their consumers").

**c. Individual determinations preclude certification of Murray's unjust enrichment and breach of contract claims.**

"'[T]he facts necessary to support [breach of contract and unjust enrichment] are almost identical,'" *Westways World Travel, Inc. v. AMR, Corp.*, 2005 U.S. Dist. LEXIS 47291, *28 (C.D. Cal. 2005), quoting *Klay v. Humana*, 382 F.3d 1241, 1267 (11th Cir. 2004), since "the main legal difference between the two claims is that 'the obligation underlying a breach of contract claim comes most immediately from a voluntary agreement, whereas the obligation underlying an unjust enrichment claim comes directly from state law (equity).'" *Id.* *28, quoting *Klay*, 382 F.3d at 1267. Thus, where predominance fails as to one, it also fails as to the other. *Id.* *28-29.[19]

Murray must show that Defendants unjustly retained proceeds from the sale of the Subject Dryers, *Cartwright v. Viking Indus.*, 2009 U.S. Dist. LEXIS 83286, *41 (E.D. Cal. 2009), which, in the context of class certification, requires classwide proof that the Subject Dryers cause rust stains, that Defendants made material misrepresentations about stainless steel, and that consumers

---

[19] Murray's contract and unjust enrichment claims cannot co-exist. *Deitz v. Comcast Corp.*, 2007 U.S. Dist. LEXIS 53188, *22-23 (N.D. Cal. 2007); *accord Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1388-89 (2d Dist. 2012). He cites no caselaw to the contrary.

paid a premium. Murray has provided no common proof for any of those propositions, *see* Part III.B.1, and, in any such inquiry, individual determinations would clearly predominate. Similarly, to recover for breach of contract, each class member must prove "(1) the existence of a contract, (2) performance … or excuse for nonperformance, (3) breach by [Sears], and (4) damage." *In re Facebook, Inc., PPC Adver. Litig.*, 282 F.R.D. 446, 455 (N.D. Cal. 2012). Murray admits that some putative class members never experienced any problems with their Subject Dryer(s), and got their value from them. Murray Tr. at 223-24. He agrees that other members will have "sold their dryers for full value … depend[ing] on the individual circumstances." *Id.* at 227-28. "[W]here damages calculations are not a matter of straightforward accounting, damages can be a factor in the predominance analysis." *Facebook*, 282 F.R.D. at 459. Here, the proposed class would sweep in thousands of people who have never experienced any problems akin to his allegations. Damages under such circumstances defeat predominance. *Id.*

**2. A Class Action Is Not a Superior Vehicle for Resolving Murray's Claims.**

Murray provides no "suitable and realistic plan for trial of the class claims," and this Court cannot "rely merely on assurances of counsel that any problems with predominance or superiority can be overcome." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001). Murray sets out no plan at all, providing no indication of how any trial would actually proceed – a significant failure, since the foregoing (including Murray's own experience and testimony) shows that individualized determinations will predominate.[20]

## IV. CONCLUSION

For the forgoing reasons, Defendants respectfully request that this Court deny the Motion.

---

[20] Furthermore, Murray's purported showing of superiority consists of rote recitation of the factors for superiority, even where they are obviously false in light of *Thorogood*. Mot. at 23 (asserting that granting the Motion will "reduce the likelihood of inconsistent rulings," and denying that there is other litigation "on the challenged business acts or practices").

Dated: January 18, 2013

By: */s/ Philip M. Oliss*
Philip M. Oliss

Attorneys for Defendant
SEARS, ROEBUCK AND CO.

SQUIRE SANDERS (US) LLP
Mark C. Dosker (CA Bar # 114789)
mark.dosker@squiresanders.com
275 Battery Street, Suite 2600
San Francisco, CA 94111
Telephone: +1.415.954.0200
Facsimile: +1.415.393.9887

SQUIRE SANDERS (US) LLP
Philip M. Oliss (admitted *pro hac vice*)
philip.oliss@squiresanders.com
Bruce Khula (admitted *pro hac vice*)
bruce.khula@squiresanders.com
4900 Key Tower
127 Public Square
Cleveland, OH 44114
Telephone: +1.216.479.8500
Facsimile: +1.216.479.8780

Dated: January 18, 2013

By: */s/ Kathleen P. Lally*
Kathleen P. Lally

Attorneys for Defendant
ELECTROLUX HOME PRODUCTS, INC.

LATHAM & WATKINS LLP
Svetlana M. Berman (CA Bar # 239445)
svetlana.berman@lw.com
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095

LATHAM & WATKINS LLP
Mark S. Mester (admitted *pro hac vice*)
mark.mester@lw.com
Kathleen P. Lally (admitted *pro hac vice*)
kathleen.lally@lw.com
233 South Wacker Drive, Suite 5800
Chicago, IL 60606
Telephone: +1.312.876.7700
Facsimile: +1.312.993.9767